**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH P. KACHIK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 09-149 Erie |
| | ) | |
| v. | ) | District Judge McLaughlin |
| | ) | Chief Magistrate Judge Baxter |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.  RECOMMENDATION

It is respectfully recommended that the Commissioner's motion for summary judgment (*Document No. 10*) be denied, and that Kachik's motion for summary judgment (*Document No. 8*) be denied to the extent that it requests an award of benefits, but granted to the extent that it seeks a vacatur of the administrative decision of the Commissioner with a concomitant remand for further proceedings.

## II.  REPORT

### A.    Procedural History

Plaintiff Joseph P. Kachik ("Kachik") commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. Kachik protectively applied for DIB and SSI benefits on March 20, 2003, alleging that he had become disabled on January 3, 2003. (Tr. 14, 80, 101, 291-292). The claims were administratively denied on December 2, 2003, after Kachik failed to appear for a scheduled consultative medical examination. (Tr. 14, 64, 66, 289, 294). On December 23, 2003, Kachik filed a timely request for an administrative hearing. (Tr. 70). A hearing was scheduled for September 17, 2004, but Kachik did not appear on that occasion. (Tr. 31-33). Kachik's request for a hearing was dismissed on October 19, 2004, thereby making the

1

previous denials final.  (Tr. 29-32).

Kachik protectively filed new applications for DIB and SSI benefits on July 14, 2005, alleging disability as of Februrary 28, 2002.  (Tr. 14, 301, 328, 334, 605-606).  A consultative medical examination was initially scheduled for October 18, 2005, and later rescheduled for November 22, 2005, but Kachik failed to appear on both occasions.  (Tr. 300).  His applications were administratively denied on December 9, 2005.  (Tr. 14, 299-300, 309, 601).  Kachik responded on December 23, 2005, by filing a timely request for an administrative hearing.  (Tr. 303).  On November 19, 2007, a hearing was held before Administrative Law Judge William T. Vest, Jr. (the "ALJ").  (Tr. 36).  Kachik, who was represented by counsel, appeared and testified in Erie, Pennsylvania.  (Tr. 38-57, 59-60).  Testimony was also taken from Barbara Byers ("Byers"), an impartial vocational expert.  (Tr. 57-58, 60-61).  The ALJ presided over the hearing from Norfolk, Virginia, by means of a video-teleconferencing apparatus.  (Tr. 38).

In a decision dated July 25, 2008, the ALJ determined that Kachik was not "disabled" within the meaning of the Act.  (Tr. 11-27).  The Appeals Council denied Kachik's request for review on April 22, 2009, thereby making the ALJ's decision the final decision of the Commissioner in this case.  (Tr. 7).  Kachik commenced this action on June 18, 2009, seeking judicial review of the Commissioner's decision.  (Doc. Nos. 1 & 2).  Kachik and the Commissioner filed motions for summary judgment on November 12, 2009, and December 9, 2009, respectively.  (Doc. Nos. 8 & 10).  These motions are ripe for decision.

### B.    Standard of Review

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## C. The ALJ's Decision

In his decision, the ALJ determined that Kachik had not engaged in substantial gainful activity subsequent to his alleged onset date of February 28, 2002. (Tr. 17). Kachik was found

4

to be suffering from an anxiety disorder, obesity, lumbar degenerative changes, dysthymia, polysubstance abuse, diabetes and hepatitis C. (Tr. 17-18). His anxiety disorder, obesity, lumbar degenerative changes, dysthymia and polysubstance abuse were deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii), while his diabetes and hepatitis C were deemed to be "non-severe." (Tr. 17-18). The ALJ concluded that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). (Tr. 18-20).

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Kachik's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, stand, sit, and walk 6 hours in an eight-hour day, and push/pull at weights no greater than lifting. The claimant retains the capacity to perform the exertional demands of light work as defined in 20 CFR 404.1567(b) and 416.967(b) in a low stress work environment. Due to the effects of the claimant's social deficits, he needs to avoid jobs requiring frequent interaction with the general public or co-workers.

(Tr. 20). Kachik had past relevant work experience as a mold maker, janitor, car mechanic and tow-truck driver. (Tr. 25, 57, 93, 114-121). Because Kachik reported that he had lifted cement blocks weighing more than 100 pounds while working as a mold maker, that position was classified at the "very heavy" level of exertion.[1] (Tr. 25, 93, 115). Byers testified that the janitor, car mechanic and tow-truck driver positions were classified at the "medium" level of exertion.[2] (Tr. 57). It was determined that Kachik could not return to his past relevant work, since he was deemed to be capable of performing only "light" work.[3] (Tr. 25).

---

[1] "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. §§ 404.1567(e), 416.967(e).

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires

Kachik was born on December 28, 1967, making him thirty-four years old as of his alleged onset date and forty years old as of the date of the ALJ's decision. (Tr. 25, 80, 328). He was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). He had a high school education and an ability to communicate in English. (Tr. 25, 40); 20 C.F.R. §§ 404.1564, 416.964. Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Kachik could work as an agricultural produce sorter or assembler. (Tr. 26). Byers' testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). (Tr. 58).

### D. Background

The Individuals with Disabilities Education Act ("IDEA") [20 U.S.C. § 1400 *et seq.*] makes a State eligible for the receipt of federal financial assistance if it submits a plan providing assurances that it "has in effect policies and procedures to ensure" that certain statutory conditions are satisfied. 20 U.S.C. § 1412(a). Several of the twenty-five conditions are relevant here. The first condition requires a State to make a free appropriate public education ("FAPE") available "to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A). The third and fourth statutory conditions require a participating State to "identify" and "locate" all disabled children residing within the State, and to ensure that each disabled child is provided with an individualized education program ("IEP") designed to meet his or her unique educational needs. 20 U.S.C. § 1412(a)(3)-(4). Pursuant to the IDEA's fifth statutory condition, a disabled child must be educated in the "least restrictive environment" possible under the relevant circumstances. 20 U.S.C. § 1412(a)(5).

The IDEA's "least restrictive environment" requirement, which is sometimes referred to as a "mainstreaming" requirement, mandates that disabled children be "educated with children who are not disabled, and [that] special classes, separate schooling, or other removal of children

---

a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

with disabilities from the regular classroom environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The structure of the IDEA evinces a congressional intent to provide disabled students with "individualized instruction where necessary and incorporation of the regular curriculum where possible." *Leighty v. Laurel School District*, 457 F.Supp.2d 546, 559 (W.D.Pa. 2006). The objective of the IDEA is to provide disabled children with the specialized assistance that they need in specific areas without excluding them from the remaining educational activities engaged in by their non-disabled peers. *Oberti v. Board of Education of the Borough of Clementon School District*, 995 F.2d 1204, 1213-1218 (3d Cir. 1993).

Kachik was a fourth-grade student during the 1977/1978 school year. (Tr. 389). At that time, he was evaluated by Thomas G. Finlan ("Finlan"), a psychologist affiliated with the Clarion Manor Intermediate Unit. (Tr. 389-390). Based on his examination findings, Finlan recommended that Kachik be enrolled in a program for educable mentally retarded students. (Tr. 389). Kachik's parents declined to follow this recommendation, and Kachik continued his education in the regular curriculum at his elementary school. *Id*.

Finlan evaluated Kachik again on March 31, 1981, when Kachik was a seventh-grader at Cranberry Junior-Senior High School ("Cranberry"). *Id*. Finlan reported that Kachik had been able to identify words at the level of a student nearing the end of the fifth grade, but that his reading comprehension ability had proven to be "extremely limited." *Id*. According to Finlan, Kachik's verbal functioning was reflective of a student within "the borderline range of intelligence." (Tr. 390). Finlan recommended that Kachik be enrolled in a program for educable mentally retarded students on a part-time basis, and that he be permitted to continue progressing through the regular curriculum in areas in which he had received acceptable scores. *Id*. Finlan also recommended that an IEP for Kachik be formulated with the assistance of Kachik's parents.[4] *Id*.

---

[4] It is not clear from the record whether these recommendations were followed.

During the spring and summer of 2000, Kachik began to complain of pain in his left shoulder. Magnetic resonance imaging ("MRI") scans conducted on June 19, 2000, and August 2, 2000, revealed no medically determinable abnormalities. (Tr. 208-209). A subsequent scan conducted on April 17, 2001, similarly indicated that Kachik's left shoulder was normal. (Tr. 207). Kachik later began to complain of back and leg pain. On June 18, 2001, an MRI scan of Kachik's left knee and leg yielded normal results. (Tr. 206). An MRI scan of Kachik's back performed on November 24, 2001, revealed that degenerative changes had occurred in his lumbar spine. (Tr. 205). On November 28, 2001, an MRI scan of Kachik's hips showed that he was suffering from "mild degenerative joint disease." (Tr. 204). A similar scan of Kachik's hips conducted on January 11, 2002, however, yielded normal results. (Tr. 203).

On February 21, 2002, Kachik went to the University of Pittsburgh Medical Center's ("UPMC") Northwest facility ("UPMC Northwest"), with complaints of pain in his teeth. (Tr. 189). He was given a prescription for Darvocet. *Id*. He later returned to UPMC Northwest and stated that the Darvocet had not been effective in controlling his symptoms. *Id*.

In June 2002, Kachik sought treatment from Dr. John E. Balmer. (Tr. 147). Dr. Balmer prescribed Oxycontin and Percocet to alleviate Kachik's back and hip pain, reporting that such pain was "intolerable without medication." (Tr. 150). On September 16, 2002, Dr. Balmer signed a statement to the Pennsylvania Department of Public Welfare ("DPW") indicating that Kachik had become "temporarily disabled" on September 9, 2002, and that this "disability" was expected to last until September 9, 2003. (Tr. 148). On December 26, 2002, Kachik told Dr. Balmer that his pain had not been controlled by Percocet, and that more Oxycontin was needed. (Tr. 138). An MRI scan of Kachik's hips conducted on January 29, 2003, revealed no abnormalities. (Tr. 134). Nonetheless, as of February 24, 2003, Kachik stated that he continued to experience pain despite his persistent use of Oxycontin and Percocet. (Tr. 133).

On March 12, 2003, Kachik went to Dr. Balmer's office and requested that the dosage of his Oxycontin prescription be increased. (Tr. 131). He also asked that he be given Methadone instead of Percocet. *Id*. He reported that he had been taking increased doses for pain control. (Tr. 129, 131). Kachik indicated that his pain would make it impossible for him to sleep if he

were to limit his dosages to those contained in Dr. Balmer's instructions. (Tr. 129). That same day, he purported to give a urine sample to one of Dr. Balmer's nurses. *Id*. Nevertheless, a treatment note describing the incident suggests that the urine sample allegedly provided by Kachik had actually been provided by someone else. (Tr. 129, 131). After learning of the incident, Dr. Balmer instructed members of his staff not to dispense more pain medications to Kachik. (Tr. 129).

In a letter to Kachik dated March 12, 2003, Dr. Balmer informed Kachik that their physician-patient relationship was being terminated. (Tr. 127). Dr. Balmer's letter stated that he would not provide Kachik with "any additional controlled substances for any reason," and that Kachik was not welcome at either of his two offices "for any reason whatsoever." *Id*. Kachik was warned that law enforcement authorities would be summoned if he were to return to one of Dr. Balmer's offices. *Id*. It was suggested that Kachik consider admitting himself to a detoxification center to alleviate his perceived "addiction to narcotic pain medication."*Id*.

On March 23, 2003, Kachik went to UPMC Northwest, complaining of pain in his mouth and teeth. (Tr. 173). He was given prescriptions for Vicodin and Penicillin. *Id*. Kachik returned to UPMC Northwest four days later, claiming that his medications were not working. (Tr. 163). He requested a prescription for Percocet. (Tr. 166).

Kachik began detoxification treatment at Turning Point on March 31, 2003. (Tr. 241). He was discharged by Turning Point on April 4, 2003, after successfully completing his treatment regimen. *Id*. That same day, Kachik was admitted to the Meadville Medical Center's "Stepping Stones Program." (Tr. 152, 155). Dr. Richard Moran reported that Kachik had problems with substance abuse and opioid dependency. (Tr. 152-153). Kachik was presented with a treatment plan on April 9, 2003. (Tr. 155-158). Nevertheless, on April 21, 2003, Kachik left the Stepping Stones Program against medical advice. (Tr. 152).

Kachik sought treatment from Dr. Thomas Chesar on May 6, 2003. (Tr. 526). He told Dr. Chesar that he did not wish to be placed back on Oxycontin. *Id*. He complained of pain in his left hip, left shoulder and lower back. *Id*. Dr. Chesar gave Kachik prescriptions for Klonopin and Percocet. *Id*.

On May 14, 2003, Kachik returned to Dr. Chesar's office, complaining of pain in his left arm and shoulder. (Tr. 525). He asked Dr. Chesar to restart his prescription for Oxycontin. *Id*. Dr. Chesar granted Kachik's request, providing him with a new Oxycontin prescription. *Id*. Meanwhile, an MRI scan of Kachik's left hip revealed that he had only a "minimal" form of degenerative joint disease with no acute abnormalities. (Tr. 162).

Dr. Chesar examined Kachik again on May 27, 2003. (Tr. 524). After reviewing the prior MRI scans of Kachik's left hip and shoulder, Dr. Chesar noted that they had all yielded normal results. *Id*. It was determined that an MRI scan of Kachik's lumbar spine was warranted. *Id*. Dr. Chesar renewed Kachik's prescriptions for Oxycontin and Percocet. *Id*. The MRI scan of Kachik's lumbar spine, which was conducted on June 3, 2003, revealed that Kachik had experienced some "degenerative disc changes." (Tr. 161).

On June 9, 2003, Kachik told Dr. Chesar that Percocet had made him feel nauseated. (Tr. 522). Dr. Chesar instructed Kachik to stop taking Percocet and to start using Morphine. *Id*. Three days later, Kachik complained of "significant back pain" that was not being alleviated by his prescriptions for Oxycontin and Morphine. *Id*. Dr. Chesar increased the dosage of Kachik's Oxycontin prescription. *Id*. Kachik returned to Dr. Chesar's office on June 17, 2003, claiming that he was still experiencing a lot of back pain. (Tr. 521). Dr. Chesar instructed Kachik to take Morphine more frequently. *Id*. On June 25, 2003, Kachik again went to Dr. Chesar's office, asking that his Morphine dosage be reduced. *Id*. He complained of facial itching in connection with his consumption of Morphine. *Id*. Dr. Chesar gave Kachik a prescription for Toprol-XL. *Id*. Kachik was instructed to discontinue his use of Morphine, and to renew his use of Percocet. *Id*.

Kachik's Oxycontin prescription was refilled on July 7, 2003. (Tr. 520). He reported that he felt better when he was taking Oxycontin. *Id*. His dosage of Toprol-XL was increased. *Id*. Dr. Chesar reported that Kachik's blood pressure was elevated. *Id*. On July 21, 2003, Kachik asked Dr. Chesar to increase the dosage of his Oxycontin prescription, complaining of worsening back pain. (Tr. 519). Dr. Chesar declined this request. *Id*. It was recommended that another MRI scan be conducted to evaluate the condition of Kachik's back. *Id*. As of August 5, 2003,

Kachik had no "new complaints." (Tr. 518). An MRI scan of Kachik's thoracic spine conducted on August 7, 2003, yielded normal results. (Tr. 226). Although Kachik was also scheduled to undergo an MRI scan of his cervical spine on that occasion, it was discontinued because of his inability to remain still during the procedure. *Id*. His prescriptions were refilled on September 4, 2003. (Tr. 516).

Kachik returned to Dr. Chesar's office on September 8, 2003, complaining of pain in his right leg and lower back. (Tr. 515). On that occasion, Dr. Chesar submitted a statement to the DPW indicating that Kachik was temporarily disabled, and that this disability was expected to last until September 8, 2004. (Tr. 559). Kachik had already scheduled an appointment with Dr. William C. Welch, a neurosurgeon affiliated with UPMC, and Dr. Chesar did not want to adjust his medication regimen until Dr. Welch was able to render an opinion concerning the source of Kachik's pain. (Tr. 515). Kachik was examined by Dr. Welch and Dr. Ira Goldstein on September 18, 2003. (Tr. 242-243). In a letter to Dr. Chesar, Dr. Welch and Dr. Goldstein stated that they were not sure what was causing the pain described by Kachik, and that they did not believe that he would benefit from surgery. (Tr. 242). They indicated that there was a "lack of correlation" between Kachik's subjective complaints and their physical examination findings. *Id*. Dr. Chesar renewed some of Kachik's prescriptions on October 14, 2003. (Tr. 513). On October 28, 2003, Kachik complained of stomach discomfort associated with his use of Percocet. (Tr. 512).

Because Kachik continued to complain of back pain that could not be explained by reference to objective medical findings, Dr. Chesar referred him to Dr. Garrett Dixon, a physiatrist. (Tr. 510). Dr. Chesar described Kachik's treatment history in a letter to Dr. Dixon dated November 25, 2003. *Id*. Kachik was apparently evaluated by Dr. Carvo[5] because of his "dependency issues." (Tr. 508). On February 19, 2004, Dr. Chesar noted that Dr. Carvo had recommended that "no further narcotics or benzodiazepines" be dispensed to Kachik. *Id*.

Dr. Dixon examined Kachik on March 23, 2004. (Tr. 277-279). Kachik was

---

[5] Dr. Carvo's first name does not appear in the administrative record.

complaining of "constant pain in the left buttock region." (Tr. 277). Dr. Dixon opined that Kachik was "suffering from hip disease on the left side." (Tr. 278). He recommended that Kachik use a cane to ambulate. *Id*. Dr. Dixon could offer no additional suggestions concerning what Kachik could do to alleviate his pain. *Id*. Kachik returned to Dr. Dixon's office on June 30, 2004, complaining of "intense pain in the lower lumbar region with radiation down the left lower extremity." (Tr. 276). Dr. Dixon's physical examination revealed that Kachik had tenderness in his "left buttock region." *Id*. Dr. Dixon could not find anything that supported the intensity of the pain described by Kachik. *Id*. Kachik asked that narcotic medications be prescribed, but Dr. Dixon refused to write such prescriptions. *Id*.

On February 15, 2005, a radiographic examination of Kachik's left hip yielded normal results. (Tr. 539). Kachik began treatment with Dr. Stuart G. Shapiro on June 21, 2005. (Tr. 397). Dr. Shapiro completed a form for the DPW indicating that Kachik was temporarily disabled, and that he would need to be reevaluated on or around September 2, 2005. (Tr. 561). Dr. Shapiro examined Kachik again on August 22, 2005. (Tr. 396). Kachik's prescription for Klonopin was refilled pending an anticipated consultation with a psychiatrist. *Id*.

Dr. Ronald McFadden, a psychiatrist, evaluated Kachik on September 14, 2005. (Tr. 399-400). It was determined that Kachik was suffering from recurrent depression and a generalized anxiety disorder. (Tr. 400). Kachik's history of polysubstance abuse was deemed to be "in full sustained remission." *Id*. Dr. McFadden prescribed Zoloft for Kachik and recommended that he participate in counseling sessions. *Id*.

Kachik returned to Dr. Shapiro's office on September 22, 2005. (Tr. 394). Dr. Shapiro submitted another statement to the DPW indicating that Kachik was temporarily disabled. (Tr. 564). On October 17, 2005, Dr. Julie Uran performed a consultative psychological evaluation of Kachik in connection with his applications for DIB and SSI benefits. (Tr. 401-408). Dr. Uran found Kachik to be suffering from a dysthymic disorder, a generalized anxiety disorder, and nicotine dependence. (Tr. 404). She indicated that Kachik was "moderately" limited in his abilities to make judgments concerning simple work-related decisions, to interact appropriately with supervisors and co-workers, and to respond appropriately to changes in a routine work

setting. (Tr. 407). Dr. Uran also reported that Kachik was "markedly" limited in his abilities to understand, remember and carry out detailed instructions, to interact appropriately with members of the general public, and to respond appropriately to work pressures in a usual work setting. *Id*.

Dr. Roger Glover, a nonexamining medical consultant, opined on November 7, 2005, that Kachik had no "marked" limitations. (Tr. 409-410). Although he indicated that Kachik had some "moderate" limitations, Dr. Glover did not deem Dr. Uran's examination report to be credible. (Tr. 410-412). Dr. Glover dismissed Dr. Uran's findings by stating as follows:

> The opinion stated within the report received 11/4/05 provided by Julie Uran, Ph.D., an examining source, has been considered. The report submitted by the examining source was not given full weight due to inconsistencies with the totality of the evidence in file [sic]. Some of the opinions cited in the report are viewed as an overestimate of the severity of the claimant's functional restrictions. The examining source statements in the report concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments, making personal and social adjustments and other work related activities are not consistent with all of the medical and non-medical evidence in the claims folder. It appears that the examining psychologist relied heavily on the subjective report of symptoms and limitations provided by the claimant. However, the totality of the evidence does not support the claimant's subjective complaints. The evidence provided by the examining source reveals only a snapshot of the claimant's functioning and is an overestimate of the severity of his limitations. Therefore, great weight cannot be given to the examining source's opinion. The psychologist appears to rely on an assessment of limitations resulting from impairments for which the psychologist has provided no treatment. The psychologist's opinion is without substantial support from the other evidence of record, which renders it less persuasive. Therefore, the report submitted by Julie Uran, Ph.D., received 11/4/05, is given appropriate weight in this assessment.

(Tr. 411-412). Dr. Glover concluded his consultative assessment by declaring that Kachik was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." (Tr. 412).

Dr. Shapiro was contacted by a medical provider affiliated with a methadone clinic in Erie, Pennsylvania, on December 7, 2005. (Tr. 393). He was asked not to prescribe Klonopin for Kachik in the future, since Kachik was believed to be abusing that drug. *Id*. Dr. Shapiro noted that he would not continue to prescribe Klonopin for Kachik. *Id*. As of July 6, 2006, Kachik was taking Lisinopril. (Tr. 392).

On August 17, 2007, Kachik was treated at UPMC Northwest for dental pain. (Tr. 434-

13

441).  Kachik was hospitalized at UPMC Northwest on September 27, 2007, because of weakness, weight loss and abdominal pain.  (Tr. 444).  It was determined that he was suffering from diabetes.  (Tr. 443-444).  An ultrasound showed "fatty infiltration" of Kachik's liver and "mild prominence" of his spleen.  (Tr. 492).  Kachik was discharged on September 30, 2007, after responding appropriately to treatment provided by Dr. Bradley A. Fell, Dr. Veronica Santee and Dr. Anne G. LaRochelle.  (Tr. 443).

Dr. Gerard F. Kenney and Kathryn J. Lepe, a certified physician's assistant, evaluated Kachik's hepatitis C on December 19, 2007.  (Tr. 580-582).  At the time of his visit, Kachik was taking Effexor, Klonopin, Methadone and Metformin.  (Tr. 582).  In a letter to Dr. Norman Beals dated December 21, 2007, Dr. Kenney and Lepe recommended that Kachik undergo liver function studies.  (Tr. 579).

Kachik's hearing before the ALJ was conducted on November 19, 2007.  (Tr. 36).  Subsequent to the hearing, Kachik underwent two consultative medical examinations.  Dr. Dixon, a former treating physician, performed a consultative physical examination of Kachik on May 15, 2008.  (Tr. 584-590).  Dr. Dixon completed a medical assessment form indicating that Kachik could occasionally lift or carry objects weighing up to twenty-five pounds and frequently lift or carry objects weighing up to ten pounds.  (Tr. 587).  Dr. Dixon opined that Kachik could stand or walk for up to two hours, and sit for up to six hours, during the course of an eight-hour workday.  (Tr. 588).  He further reported that Kachik would need to periodically change positions in order to remain comfortable.  (Tr. 590).  According to Dr. Dixon, Kachik could only stand or walk for approximately fifteen minutes, or sit for approximately one hour, without having to change positions.  (Tr. 588).  Kachik was also found to be limited to only occasional climbing, stooping, kneeling, balancing, crouching or crawling.  *Id*.  Dr. Dixon concluded the "assessment" portion of his examination report by stating as follows:

> From the standpoint of physical capacities, there are no actual objective findings to guide setting physical capacities, and reports of his functional limitations are complicated by his underlying mental illness.  At this time I would place him in the light range avoiding static postures, repetitive bending and lifting, carrying, squatting, crouching and climbing.  Prognosis is poor based on history, mental illness and lack of substantial objective findings on examination.

14

(Tr. 586). These observations were made by Dr. Dixon because objective diagnostic studies had "never demonstrated any condition that would explain the intensity of the pain" reported by Kachik. *Id*.

Dr. Uran performed a second consultative psychological evaluation of Kachik on May 19, 2008. (Tr. 591-599). According to Dr. Uran, Kachik was "moderately" limited in his abilities to understand and remember detailed instructions, to make judgments concerning simple work-related decisions, to interact appropriately with supervisors, and to respond appropriately to changes in a routine work setting. (Tr. 598). Kachik was found to be "markedly" limited in his ability to carry out detailed instructions. *Id*. Dr. Uran also reported "marked" to "extreme" degrees of limitation in Kachik's abilities to respond appropriately to changes in a routine work setting, to interact appropriately with co-workers, and to interact appropriately with members of the general public. *Id*.

E.     **Discussion**

Kachik attacks the ALJ's findings at the third and fifth steps of the sequential evaluation process. (Doc. No. 9 at 18-24). His argument concerning the ALJ's step-five finding centers on the ultimate residual functional capacity determination. (Doc. No. 9 at 22-23). Where a claimant is found to be *per se* disabled at the third step of the process, no residual functional capacity finding is needed. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii)(stating that a residual functional capacity assessment is used to make determinations at the fourth and fifth steps). For this reason, it is appropriate for the Court to address the ALJ's step-three findings before addressing his residual functional capacity finding.

The Listing of Impairments describes impairments which preclude an individual from engaging in substantial gainful activity without regard to his or her age, education, or past work experience. *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000). In order to qualify as *per se* disabled, a claimant must show that his or her impairment (or combination of impairments) either "matches" a Listing or is "equivalent" to a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). An impairment "matches" a Listing only if it satisfies *all* of the relevant

medical criteria. *Id.* at 530. An impairment is "equivalent" to a Listed Impairment only if it is supported by medical findings equal in severity to *all* of the criteria applicable to the most similar Listing. *Id.* The burden is on the claimant to present evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

The United States Court of Appeals for the Third Circuit has held that it is impermissible for an administrative law judge to summarily determine that a claimant's impairments do not meet or medically equal a Listed Impairment without identifying the specific Listing (or Listings) under consideration. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-120 (3d Cir. 2000). Nevertheless, an administrative law judge is not required to "use particular language or adhere to a particular format" in conducting his or her analysis. *Jones*, 364 F.3d at 505. In order to impugn an administrative law judge's analysis, a claimant must either identify a Listing that was not (but should have been) considered or point to evidence ignored or overlooked by the administrative law judge that would have warranted a finding of *per se* disability under the Listings that were considered. *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 93 (3d Cir. 2007).

Kachik argues that the ALJ erred in failing to consider the issue of *per se* disability under Listing 12.08.[6] (Doc. No. 9 at 21). Although the ALJ did not specifically reference Listing

---

[6] "12.08 *Personality Disorders:* A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
1. Seclusiveness or autistic thinking; or
2. Pathologically inappropriate suspiciousness or hostility; or
3. Oddities of thought, perception, speech and behavior; or
4. Persistent disturbances of mood or affect; or
5. Pathological dependence, passivity, or aggressivity; or
6. Intense and unstable interpersonal relationships and impulsive and damaging behvior;

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or

12.08, his step-three findings, if supported by the evidentiary record, were nevertheless dispositive of any argument that Kachik could raise concerning that particular Listing. Evaluating Kachik's impairments under Listings 12.04, 12.06[7] and 12.09, the ALJ concluded that Kachik had a "mild" degree of restriction with respect to his activities of daily living, "moderate" difficulties with respect to his maintenance of social functioning, and "mild" difficulties with respect to his maintenance of concentration, persistence, or pace. (Tr. 19). The ALJ further determined that Kachik had experienced no extended episodes of decompensation. *Id.* In order to satisfy the "B" criteria of Listing 12.08, Kachik had to show that he had "marked" limitations in two of the first three broad categories of functioning, or that he was "markedly" limited in one such category and had also experienced repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.08. His inability to make such a showing was fatal to his claim of *per se* disability under Listing 12.08, even though the ALJ did not specifically mention that Listing. (Tr. 19-20). The United States Court of Appeals for the Third Circuit has held that a remand for further proceedings is inappropriate where it is clear that the error otherwise requiring a remand did not affect the administrative decision under review. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Since the ALJ's findings with respect to the "B" criteria would have defeated Kachik's claim of *per se* disability under Listing 12.08 in any event, Kachik can attack the ALJ's step-three determination only by showing that those findings were *themselves* deficient.

The burden was on Kachik to present evidence of *per se* disability under the Listings at issue. *Williams*, 970 F.2d at 1186. As the ALJ observed in his opinion, no "acceptable medical source" had opined that Kachik's impairments were supported by the findings necessary to establish the existence of *per se* disability. (Tr. 20). On November 7, 2005, Dr. Glover rendered

---

4. Repeated episodes of decompensation, each of extended duration."

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.08 (emphasis in original).

[7] Kachik appears to argue that the ALJ failed to consider the evidence under Listing 12.06. (Doc. No. 9 at 21). This argument does not make sense, since the ALJ expressly referenced Listing 12.06 when discussing the applicable "B" criteria. (Tr. 19).

a consultative opinion concerning the "B" criteria that was ultimately reflected in the ALJ's step-three finding.[8]  (Tr. 19, 423).  Although Kachik makes reference to the fact that he was diagnosed with a "personality disorder," he makes no attempt to specifically address the ALJ's findings concerning the "B" criteria of Listing 12.08.  (Doc. No. 9 at 21-22).  Therefore, he cannot impugn the ALJ's determination at the third step of the sequential evaluation process.

Kachik also attacks the ALJ's residual functional capacity assessment.[9]  (Doc. No. 9 at 18-24).  A thorough review of the evidentiary record reveals that the ALJ's residual functional capacity determination was defective.  Specifically, the ALJ failed to account for several of Kachik's physical and mental limitations.

In this case, Dr. Dixon was both a treating physician and an examining physician.  Based on his consultative physical examination of Kachik on May 15, 2008, Dr. Dixon determined that Kachik could engage in "light" work that did not involve more than occasional climbing, stooping, kneeling, balancing, crouching or crawling.  (Tr. 586-588).  Dr. Dixon's findings could potentially be characterized as "internally contradictory" with respect to Kachik's alleged ability to perform "light" work, since Dr. Dixon found Kachik to be capable of standing or walking for only about two hours during the course of an eight-hour workday.  (Tr. 588);  *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991)(explaining that an administrative law judge need not credit "internally contradictory" evidence submitted by a claimant's treating physician).  The standing and walking limitations identified by Dr. Dixon were inconsistent with his statement that Kachik could perform a "light range" of work, since "light work," by definition, generally "requires a

---

[8]  The Court acknowledges that the ALJ should have specifically referenced Dr. Glover's consultative findings in his opinion if he wanted to base a step-three determination on those findings.  *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  This omission by the ALJ, however, was inconsequential.  Since Kachik failed to satisfy his own burden of production at the third step of the process, the Commissioner was not required to provide specific evidentiary support for rejecting Kachik's allegation of *per se* disability.  *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)("Because Williams did not meet his burden of production, the Secretary was not required to submit conflicting evidence to refute his claims.").

[9]  Treatment notes from Rural Mental Health Associates dated August 18, 2008, were submitted to the Appeals Council in connection with Kachik's request for review.  (Tr. 6A, 614-619).  Since these treatment notes were never submitted to the ALJ prior to the issuance of his decision, the Court cannot consider them for the purpose of determining whether the ALJ's residual functional capacity determination is "supported by substantial evidence."  *Matthews v. Apfel*, 239 F.3d 589, 591-595 (3d Cir. 2001).

good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b). Moreover, Dr. Dixon candidly admitted that he had "no actual objective findings to guide" his assessment of Kachik's functional limitations. (Tr. 586). Consequently, the ALJ may have had a legitimate basis for rejecting the standing and walking limitations described in Dr. Dixon's examination report. (Tr. 23). It does not follow, however, that the ALJ had legitimate reasons for rejecting *all* of the postural limitations identified by Dr. Dixon. (Tr. 23, 586, 588).

In his examination report, Dr. Dixon stated that Kachik had "appeared to be in some pain" while positioning himself on and off of the examining table. (Tr. 585). The examination revealed that Kachik had tenderness in his "left lower paraspinals and left buttock muscles," as well as left groin pain associated with "flexion and external rotation on the left." *Id.* Dr. Dixon further observed that Kachik was "unable to walk on the toes of [his] left foot," and that he would shift his weight "to the right side" while attempting to retrieve an object from the floor. (Tr. 586). These examination findings, while not necessarily indicative of a "disabled" individual, were also not indicative of an individual with *no* postural limitations.

In his residual functional capacity assessment and corresponding hypothetical question to Byers, the ALJ incorporated *none* of the postural limitations described by Dr. Dixon. (Tr. 20, 57-58). While Dr. Dixon appeared to lack confidence in his own ability to precisely determine Kachik's actual limitations, his examination findings nevertheless revealed that Kachik had some postural limitations. The ALJ pointed to no countervailing evidence to justify his rejection of the postural limitations identified by Dr. Dixon. Instead, he apparently adopted Dr. Dixon's finding that Kachik could perform "light work" without accounting for any of the other physical limitations at issue. (Tr. 20-25). Dr. Dixon evidently believed that, at a minimum, Kachik needed to occasionally change positions in order to remain comfortable. (Tr. 590). The ALJ never accounted for this finding when he determined Kachik's residual functional capacity. (Tr. 20).

The United States Court of Appeals for the Third Circuit has admonished that an administrative law judge "is not free to set his own expertise against that of a physician who presents competent evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). The

opinion of a treating physician can be rejected only on the basis of contradictory medical evidence, and not on the basis of an administrative law judge's "own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The Court acknowledges that the ALJ was not required to afford significant weight to the conclusory opinions of "disability" that had previously been submitted by some of Kachik's treating physicians. (Tr. 23, 554-567). The ultimate question of disability is reserved for the Commissioner's determination. *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Some federal courts have concluded that unsupported opinions of "disability" submitted by treating physicians are not even "medical opinions" entitled to consideration. *Allen v. Commissioner of Social Security*, 561 F.3d 646, 652 (6th Cir. 2009); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *Luce v. Astrue*, 523 F.Supp.2d 922, 936 (S.D.Iowa 2007); *Earl-Buck v. Barnhart*, 414 F.Supp.2d 288, 293 (W.D.N.Y. 2006); *Wheat v. Barnhart*, 318 F.Supp.2d 358, 364, n. 11 (M.D.La. 2004). A statement by a treating physician indicating that his or her patient is statutorily "disabled" is not significantly probative in the absence of evidence that the physician possesses vocational expertise. *Wadford v. Continental Casualty Co.*, 261 F.Supp.2d 402, 412 (W.D.N.C. 2003); *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C. 2001). The availability or unavailability of jobs consistent with a given claimant's abilities and limitations is a question for a *vocational* expert rather than a question for a *medical* expert. 20 C.F.R. §§ 404.1566(e), 416.966(e). A true "medical opinion" is an opinion specifically explaining what an individual can or cannot do in light of the functional limitations caused by his or her medically determinable impairments. 20 C.F.R. §§ 404.1567(a)(2), 416.927(a)(2).

While the opinions expressed by some of Kachik's treating physicians indicating that he was "disabled" were not really "medical opinions," the same cannot be said of Dr. Dixon's examination report. Having both treated Kachik and examined him on a consultative basis, Dr. Dixon was familiar with Kachik's medical problems. Even if the ALJ was justified in rejecting the portions of Dr. Dixon's examination report that appeared to be in tension with other aspects of that same report, he was not justified in rejecting *all* of the physical limitations referenced by

Dr. Dixon aside from Kachik's limitation to "light" work. (Tr. 20-23). If he believed Dr. Dixon's examination report to be unreliable, "it was incumbent upon the ALJ to secure additional evidence from another physician." *Ferguson*, 765 F.2d at 37. The ALJ was not free to simply disregard Dr. Dixon's assessment without relying on conflicting medical evidence. *Plummer v. Apfel*, 186 F.3d 422, 429-430 (3d Cir. 1999).

In determining Kachik's mental capabilities, the ALJ made the following comments about Dr. Glover's consultative assessment:

> The mental health medical source opinions have also been considered fully. As for the opinion evidence, the psychological reviewer at the initial determination concluded that the claimant remained able to make simple decisions, maintain regular attendance, understand and remember instructions, concentrate, interact with others, and adapt to changes in the workplace. In summary, he was found capable of the basic mental demands of competitive work (Ex. B5-F). The undersigned affords significant weight to this finding, which is consistent with the evidence added to the record subsequently. However, the undersigned concluded that the residual functional capacity reached in this decision better articulates the claimant's anxiety derived limitations by specifically addressing the claimant's need for a low stress environment with less than frequent interaction with co-workers or the public.

(Tr. 23-24). With respect to mental limitations, the ALJ concluded only that Kachik needed to work in a low-stress environment, and that he needed to avoid frequent interaction with co-workers and members of the general public. (Tr. 20). As the ALJ's opinion indicates, he rejected several "moderate" limitations which had been identified by Dr. Glover.

Dr. Glover found Kachik to be "moderately" limited in his abilities to complete a normal workday or workweek at an acceptable pace without experiencing psychologically-based interruptions, to interact appropriately with members of the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and to respond appropriately to changes in a work setting. (Tr. 410). Although the ALJ purported to give "significant weight" to Dr. Glover's view that Kachik was capable of meeting "the basic mental demands of competitive work on a sustained basis," he did not directly account for all of the specific limitations identified in Dr. Glover's consultative

report. For instance, the ALJ's residual functional capacity finding was consistent with an individual who could have *unlimited* contact with supervisors, even though Dr. Glover believed Kachik to have some degree of limitation in his ability to interact and communicate with supervisors. (Tr. 20, 410). Under the Commissioner's regulations, a "moderate" limitation is indicative of a "severe" impairment. *Bennett v. Barnhart*, 264 F.Supp.2d 238, 255 (W.D.Pa. 2003); 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Consequently, a "moderate" limitation significantly limits an individual's ability to engage in basic work activities, even if it is not "disabling" in nature. 20 C.F.R. §§ 404.1521(a), 416.921(a). The ALJ never explained why he found it necessary to discount the limitations identified by Dr. Glover that were not accounted for in the ultimate residual functional capacity determination.

While the ALJ expressly discounted Dr. Uran's 2008 examination report, he stated that he was "fully" adopting the opinions expressed in her 2005 examination report. (Tr. 24). When the residual functional capacity finding is broken down on a function-by-function basis, however, it becomes clear that the ALJ failed to account for some of the limitations contained in the same examination report that he purported to "fully" adopt. For instance, the ALJ apparently found no limitations concerning Kachik's ability to interact with supervisors, even though Dr. Uran found Kachik to be "moderately" limited in that area. (Tr. 20, 407). This example further serves to illustrate the defective nature of the ALJ's residual functional capacity assessment (and corresponding hypothetical question) in this case.[10]

At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). In order for a vocational expert's answer to a hypothetical question to constitute competent evidence of the

---

[10] It is worth noting that the ALJ's residual functional capacity determination (and corresponding hypothetical question to Byers) did not account for Kachik's implicit limitation to "unskilled" work. (Tr. 20, 57-58). This omission was inconsequential, since the jobs identified by Byers were "unskilled" jobs. (Tr. 58). Nevertheless, the ALJ's reference to a "low-stress work environment" simply failed to account for Kachik's apparent inability to understand, remember and carry out detailed instructions. (Tr. 20, 57-58, 407).

existence of jobs consistent with a claimant's residual functional capacity, the administrative law judge's hypothetical question must adequately convey to the vocational expert *all* of the claimant's credibly established limitations. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). If a credibly established limitation is not included within the hypothetical question, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002). Of course, an administrative law judge is free to reject limitations that he or she does not believe to be credibly established in the evidentiary record. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 205-206 (3d Cir. 2008); *Rutherford*, 399 F.3d at 553-555. In this case, however, the ALJ appears to have rejected several limitations identified by Dr. Dixon, Dr. Glover and Dr. Uran without relying on contradictory medical evidence. Hence, the administrative decision at issue is not "supported by substantial evidence" within the meaning of § 405(g).

The only remaining question is whether Kachik is immediately entitled to an award of benefits, or whether a remand for further proceedings is in order. A judicially-ordered award of benefits is proper only where the record has been fully developed, and where the evidence as a whole clearly points in favor of a finding that the claimant is disabled. *Morales*, 225 F.3d at 320. That standard is not met here. Much of the evidence relied upon by Kachik is inconclusive. Moreover, it is unclear whether Byers would have been able to identify jobs in the national economy consistent with Kachik's work-related abilities and limitations if the ALJ had properly accounted for all of Kachik's credibly established limitations. Consequently, the proper remedy in this case is a remand for further administrative proceedings. No opinion is expressed as to whether Kachik will ultimately be able to establish his entitlement to DIB and SSI benefits under Titles II and XVI of the Act.

### F.    Conclusion

For the foregoing reasons, the Commissioner's decision denying Kachik's applications for DIB and SSI benefits is not "supported by substantial evidence." 42 U.S.C. § 405(g). Accordingly, it is respectfully recommended that the Defendant's motion for summary judgment

(*Document No. 10*) be denied, and that the Plaintiff's motion for summary judgment (*Document No. 8*) be denied to the extent that it requests an award of benefits, but granted to the extent that it seeks a vacatur of the administrative decision of the Commissioner of Social Security and a remand for further proceedings. It is further recommended that the decision of the Commissioner of Social Security be vacated, and that the case be remanded to him for further administrative proceedings consistent with this report and recommendation.

In accordance with 28 U.S.C. § 636(b)(1), the parties may file written objections to this report and recommendation within fourteen (14) days of the date on which they are served with copies of it.

/s/ Susan Paradise Baxter
Susan Paradise Baxter
United States Magistrate Judge

Dated: August 4, 2010

cc:     All counsel of record

U.S. District Judge Sean J. McLaughlin